UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY  DIVISION

| | | |
|---|---|---|
| WENDY STEVENS and STEPHANIE VILLALPANDO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 4:06-cv-79-SEB-WGH |
| | ) | |
| LIFE CARE CENTERS OF AMERICA, INC., d/b/a GREEN VALLEY CARE CENTER, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendant's Motion for Summary Judgment [Docket No. 67], filed on December 26, 2007, pursuant to Federal Rule of Civil Procedure 56.  Plaintiffs, Wendy Stevens and Stephanie Villalpando, bring this claim against their former employer, Defendant, Life Care Centers of America, Inc. ("Life Care"), d/b/a Green Valley Care Center ("Green Valley"), for its allegedly discriminatory actions towards them based on their sex and for allegedly retaliating against them for engaging in protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*  Plaintiffs have also brought claims for unpaid wages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* and Indiana wage law, Ind. Code § 22-2-5 *et seq.*  Further, Plaintiffs contend that Defendant is liable under Indiana law for negligent retention and supervision of one of its employees.  For the

reasons detailed in this entry, we <u>GRANT IN PART</u> and <u>DENY IN PART</u> Defendant's

Motion for Summary Judgment.[1]

## **Factual Background**

Green Valley, owned by Life Care, operates as a long-term care facility in New

Albany, Indiana.  In April 2004, Plaintiff Wendy Stevens was hired at Green Valley as a

licensed practical nurse ("LPN").  Throughout her tenure, Ms. Stevens primarily worked

in Unit 200 where she reported to Unit Director Helen Jeffrey.  However, Ms. Stevens

often worked in other areas of the building when she volunteered for overtime or

additional shifts.  Plaintiff Stephanie Villalpando was hired at Green Valley as an LPN in

September 2004.  She worked in Unit 400, which houses high acuity residents, and

reported to Unit Director Sherry Haney.

---

[1] On May 25, 2008, subsequent to the filing of its motion for summary judgment, Life Care filed a Motion for Leave to File Instanter Defendant's Response in Opposition to Plaintiffs' Surreply [Docket No. 111], contending that Plaintiffs' Surreply "exceeds the proper scope outlined in Rule 56 by introducing new facts, repeating earlier objections without citing to admissible evidence, and making additional arguments."  Docket No. 111 at 2.  Defendant's Motion is hereby <u>DENIED</u>.  Initially, as Life Care concedes, neither Federal Rule of Civil Procedure 56, nor Local Rule 56.1, provides for a response to a surreply.  Furthermore, the Court is perfectly well-equipped to determine which facts and arguments in Plaintiffs' Surreply are, or are not, material to the dispute without the benefit of Defendant's response, especially in light of the fact that the parties already requested and were granted leave to file oversized briefs, in addition to the over 800 pages of record tendered in support of their respective positions.
Defendant's Motion to Substitute Signed Affidavit of Brenda Berryman [Docket No. 113], filed on May 28, 2008, is <u>DENIED AS MOOT</u> (Ms. Berryman's Affidavit was filed in support of Defendant's motion to file a response to Plaintiffs' Surreply).  Additionally, Plaintiffs' Motion to Strike Defendant's Motion for Leave to File Instanter Defendant's Response in Opposition to Plaintiff's Surreply [Docket No. 114], filed on June 4, 2008, is <u>DENIED AS MOOT</u>.

At the time of the events alleged by Ms. Stevens and Ms. Villalpando, Green

Valley was being run by the Interim Executive Director, Tony Thomas, who reported to

the Regional Vice President, Mary Pankey.  At Green Valley, Department Directors, such

as the Director of Nursing ("DON"), report to the Executive Director and obtain nursing

guidance and assistance from a Regional Director of Clinical Services.  The nursing staff

reports to the DON.  In early 2005, Ryan Campbell was hired at Green Valley and

throughout his tenure he held a variety of titles, including Assistant Director of Nursing

("ADON") and Interim DON, until he left the facility in August 2006.  As DON, Mr.

Campbell supervised all members of Green Valley's nursing staff, including Ms. Stevens

and Ms. Villalpando.

**Ms. Stevens's Performance and Discipline**

The parties do not dispute that, for most of her tenure at Green Valley, Ms. Stevens

had an average disciplinary record, with only a few counseling sessions for issues such as

tardiness.  However, on June 10, 2005, Ms. Stevens got into a verbal altercation with

Barbara Reed, a nurse from a different unit.  According to Ms. Stevens, co-workers had

come to her on a number of occasions and complained that Ms. Reed was being mean to

them.  When Ms. Stevens approached Ms. Haney, a Unit Director and ADON, regarding

how to handle the problems with Ms. Reed, Ms. Haney allegedly told Ms. Stevens to

"give it right back to her."  Stevens Dep. at 158.  Therefore, on June 10, 2005, Ms.

Stevens claims that she asked Ms. Reed, "Barb, why do you have to act like such a bitch

to the CNAs and the other nurses?"  Id. at 159.  According to Life Care, in addition to accusing Ms. Reed of "being a bitch," Ms. Stevens made other unprofessional and inappropriate comments and threatened to provoke a fight.  Ms. Stevens denies these allegations.

Ms. Stevens contends that she reported the incident with Ms. Reed to her Unit Director, Ms. Jeffery, informing Ms. Jeffery that she (Ms. Stevens) had previously asked Ms. Haney for advice about dealing with Ms. Reed.  Stevens Dep. at 161.  Ms. Stevens then met with Mr. Thomas, who, according to Ms. Stevens, "acted like he knew how [Ms. Reed] was so he wasn't very concerned about it.  He also stated that he has never had any problems with me, so he knew this was an isolated incident."  Stevens Dep. Exh. 38. However, on June 23, 2005, following an investigation of the incident by corporate, Ms. Stevens was issued a second written warning[2] for the use of "inappropriate language while addressing another staff member."  Stevens Dep. Exh. 22 (Corrective Action Form).  The written warning required Ms. Stevens to apologize to Ms. Reed and further provided that, if the problem persisted, termination would be the next corrective step.  Id.

In addition to the written warning, on June 30, 2005, Regional Vice President Mary Pankey, Interim Executive Director Antonio Thomas, and Regional Director of Clinical Services[3] Brenda Berryman, met with Ms. Stevens to further discuss the incident.

---

[2] It is unclear from the factual record when the first warning was issued or what it entailed.

[3] The Regional Director of Clinical Services is responsible for providing nursing support
(continued...)

Berryman Dep. at 184, 216.  At the meeting, Ms. Stevens gave Ms. Pankey an apology note to give to Ms. Reed (as was required in the Corrective Action Form) and Ms. Pankey instructed Ms. Stevens not to discuss the incident with other staff members.  Stevens Dep. Exh. 38; Pankey Dep. at 179; Berryman Dep. at 39.  Almost immediately after leaving the meeting, Life Care contends that Ms. Stevens began talking with some of her colleagues, including her supervisor, Ms. Jeffrey, at the nursing station about the incident with Ms. Reed and the meeting that had just been held.  Pankey Dep. at 181; Berryman Dep. at 185, 219.  According to Ms. Stevens, she told Ms. Jeffrey about what had transpired at the meeting because she (Ms. Stevens) was upset and needed to get permission from Ms. Jeffrey to take a break.  Stevens Dep. at 171; Stevens Dep. Exh. 38.  Other than that conversation with Ms. Jeffrey, however, Ms. Stevens denies speaking about either the meeting or incident with Ms. Reed after June 30, 2005, the date on which Ms. Stevens contends she was first told to refrain from discussing the situation with her colleagues.

However, on July 6, 2005, Ms. Stevens was terminated because, according to Life Care, she allegedly continued to talk about the incident and bother Ms. Reed.  Pankey Dep. at 182-83.  Although Mr. Campbell completed and signed Ms. Stevens's termination form, Ms. Pankey testified that she and Mr. Thomas were the ones who actually made the decision to terminate Ms. Stevens.  Id. at 183-84.  Ms. Stevens claims that, when he

---

[3](...continued)
to a variety of facilities owned by Life Care, but does not have the authority to hire, fire, or unilaterally discipline employees.  Berryman Dep. at 20, 25.

terminated her, Mr. Campbell told her that, "I really hate that they're making me do this. I know how good you are to us.  I know you are the only one I have that will work extras and doubles and come in any time I ask you.  And I can't believe they're making me do this.  And I'm really mad about it, but they're making me term you for what you said to Barb [Reed]."  Stevens Dep. at 153.

**Ms. Stevens's Complaints to Life Care**

The parties dispute when Ms. Stevens initially reported that she had been subjected to sexual harassment by Mr. Campbell.  According to Life Care, Ms. Stevens never complained during her tenure at Green Valley, nor during her termination meeting, that she had been sexually harassed by Mr. Campbell.  Instead, Life Care contends that, after she was terminated, she first reported the conduct via a faxed letter to Life Care's corporate offices.  See Stevens Dep. Exh. 38.  Ms. Stevens alleges that, on June 25, 2005, two days after she received her second written warning for the incident with Ms. Reed, she picked up a call placed to the shared nursing station phone.[4]  Stevens Dep. at 83-84. According to Ms. Stevens, the caller was Mr. Campbell and he proceeded to make a number of inappropriate comments, including asking if he could come and visit her, commenting that he bet she looked good, asking if she would come for a ride with him,

_____

[4] In her deposition, Ms. Stevens testified that she could not remember whether she was paged to answer the phone or if she just happened to be the one who answered it.  Stevens Dep. at 84.

and finally requesting that she come out to his car to give him "a little head." Id. at 88-89.

Life Care claims that the post-termination letter was the first official complaint about the incident that Ms. Stevens ever made. Ms. Stevens contends otherwise, however. She asserts that almost immediately after receiving the call she went to Angela Jones, a Unit Director, and told Ms. Jones that Mr. Campbell had called her and that she needed to talk about it. Stevens Dep. at 99-100. Ms. Stevens contends that, after she told Ms. Jones about the incident, Ms. Jones called Mr. Thomas to tell him what had happened, informing him that Ms. Stevens was upset by Mr. Campbell's phone call and that she was not interested in Mr. Campbell's proposition. Id. at 136. According to Ms. Stevens, Ms. Jones later told her that Mr. Thomas and Mr. Campbell were friends and that Mr. Thomas was afraid that Ms. Stevens would tell corporate about Mr. Campbell's telephone call. Id. at 105.

Ms. Stevens also told her supervisor and Unit Director, Ms. Jeffery, about the telephone call she had received from Mr. Campbell and informed Ms. Jeffrey that she (Ms. Stevens) had already reported the incident to Ms. Jones. Jeffery Dep. at 25. In her deposition, Ms. Jeffery testified that, during that telephone call, she told Ms. Stevens that if she found the incident to be serious, she needed to document it in writing so that Green Valley could investigate and take appropriate action, but that Ms. Stevens declined because she "did not want to get him in any trouble." Jeffrey Dep. at 25, 32. Ms. Stevens denies that she was ever instructed to complete a written complaint, but concedes that she

7

did not ask Ms. Jeffrey to "do anything above [Mr. Thomas and Mr. Campbell], like go to corporate or anything like that."  Stevens Dep. at 178.  Finally, Ms. Stevens contends that she referred to her prior complaints about Mr. Campbell again at her termination meeting, stating to Mr. Campbell that she knew her termination was related to her previous reports about the phone call.  Stevens Aff. ¶ 6.

In addition to the alleged lewd telephone call, Ms. Stevens claims that a week or two before she received the call from Mr. Campbell, he hugged her from behind on one occasion and told her, "I don't know what we would do without you.  You know you're always coming in at our beckon call."  Stevens Dep. at 91.  However, Ms. Stevens testified that, at the time, she simply told him "thank you" and did not think "he was trying to touch a certain part of my body or anything."  Id. at 91, 140.  Ms. Stevens contends that she told Ms. Jeffery about the hug, but that "I wasn't complaining. I was just telling [Ms. Jeffery]."  Id. at 142.  She did not report the incident to anyone else at Green Valley.

Finally, Ms. Stevens claims that when she first met Mr. Campbell, she (and Ms. Jeffery) witnessed him "grinding and singing that candy song . . . with lyrics including '[I'll] let you lick my lollipop.'"[5] Stevens Dep. at 142.  Ms. Stevens asserts that he sang it in front of the nurses at Green Valley on a number of occasions, but never directed it

---

[5] It appears the song to which Ms. Stevens is referring is "Candy Shop," performed by the rapper 50 Cent and singer Olivia.

specifically at any one individual.[6] Id. at 145.  According to Ms. Stevens, Ms. Jeffery was present the first time Ms. Stevens saw Mr. Campbell perform the song and merely told Ms. Stevens that Mr. Campbell was Green Valley's new ADON.[7] Id. at 46. However, it appears that Ms. Stevens did not officially report this behavior or complain about it to any of her supervisors.

**Ms. Villalpando's Performance and Discipline**

Ms. Villalpando was hired at Green Valley in September 2004, despite the fact that the management at Green Valley was aware that she did not have previous experience working in a nursing home.  Due to her lack of experience, she often sought the advice of her Unit Director and ADON, Ms. Haney, and co-worker, Ms. Reed.  Haney Dep. at 28-29.  Life Care contends that, despite the counsel of more experienced co-workers and supervisors, in her first few months of employment at Green Valley, Ms. Villalpando performed poorly on several occasions, resulting in her receiving a written warning (the first step in Green Valley's progressive discipline process) on November 8, 2004, for her

---

[6] Ms. Berryman testified that she had never witnessed Mr. Campbell sing or dance. Berryman Dep. at 90.  Ms. Haney, however, testified that she had seen Mr. Campbell sing the song, stating "it was like, I'm the candy man or come lick my lollypop [sic], lica, lica, or something like that, and he would do these moves, like he would shake and it would be like a bump and grind, and then he would grab his crotch."  Haney Dep. at 31.

[7] In her deposition, Ms. Jeffery testified that, even though she worked with Mr. Campbell on a daily basis, she could not recall ever hearing him sing song lyrics or seeing him dance, nor could she recall anyone complaining about such behavior.  Jeffrey Dep. at 22.

alleged failure to detect missing pain medication.[8]  Villalpando Dep. at 170.

According to Life Care, Ms. Villalpando's job performance only worsened after she received her initial written warning.  As a result, Life Care contends that, during her first nine months of employment, she was counseled for various transgressions, including her alleged failure to count medications in Green Valley's Emergency Drug Kit, failure to document Medicare resident charts and complete admission paperwork, and failure to complete other work assignments and resident treatments.  Additionally, Life Care contends that Ms. Villalpando was reprimanded for rude behavior that she allegedly exhibited while dealing with the residents' family members and fellow Green Valley staff members.  Although Ms. Villalpando concedes that she was written up for some of these alleged incidents, she denies that she exhibited sub-standard nursing care on any occasion.

In May 2005, Life Care contends that Green Valley was cited by the Department of Health and Human Services, allegedly stemming from an incident in which Ms. Villalpando admitted that she had failed to notify a resident's physician to obtain an order to treat an open wound.  Pankey Dep. at 87-88.  Ms. Villalpando asserts that she did not contact the resident's physician to obtain the order because she thought that Ms. Haney was responsible for doing so.  Villalpando Dep. at 189.  This incident resulted in Ms. Haney counseling Ms. Villalpando with a thirty-day performance improvement plan and

---

[8] The first written warning was issued prior to the start of Mr. Campbell's tenure at Green Valley.

in-service.  The next month, a pharmaceutical representative complained that Ms.

Villalpando had acted rudely and that she had failed to give a resident a pain patch in a

timely manner.  Id. at 195-197.  According to Ms. Villalpando, the resident already had a

pain patch and it was not due to be replaced until the next day.  Id. at 199; Villalpando

Aff. ¶ 4.  In light of these alleged incidents of misconduct, on June 17, 2005, Ms. Haney

and Mr. Campbell informed Ms. Villalpando that she would be terminated.[9]

Three days later, on June 20, 2005, Mr. Thomas telephoned Julia Taylor, Division

Director of People Development, to inform Ms. Taylor that Ms. Villalpando had been

terminated for poor job performance and attitude problems.  Taylor Dep. at 27.  Later on

that same day, Ms. Villalpando telephoned Ms. Taylor to complain that she had been

wrongfully terminated.  Id. at 29; Taylor Dep. Exh. 50.  In order to investigate Ms.

Villalpando's complaint, Ms. Taylor requested that Mr. Thomas fax to her the

documentation regarding Ms. Villalpando's termination, which he did.  Based on her

review of the documentation, Ms. Taylor recommended that Ms. Villalpando be

reinstated, largely because all of the documentation in support of her termination was

written and dated the same day of the investigation (June 20, 2005) and merely recounted

prior events.  Taylor Dep. at 30, 38-39.  The documentation did not include any write-ups

or warnings that Ms. Villalpando was supposed to have received at the time of the alleged

---

[9] In her deposition, Ms. Haney testified that she did not believe that Ms. Villalpando
should be terminated, but instead should have been transferred to a less demanding unit at Green
Valley until she gained more experience.  Haney Dep. at 26-28.

incidents.  Thus, because there was no documentary evidence of prior disciplinary action regarding poor performance, Ms. Taylor concluded that there was insufficient support for the termination.  Accordingly, on June 21, 2005, Ms. Taylor informed Ms. Villalpando that she would be reinstated to her position.

Life Care contends that, after her reinstatement, Ms. Villalpando's performance continued to be subpar.  On July 15, 2005, Ms. Villalpando was disciplined for her failure to conduct a scheduled resident admission intake procedure before her shift ended on July 14, 2005, which forced the next shift nurse to complete the process.  See Villalpando Dep. Exh. 8 (Corrective Action Form).  Ms. Villalpando contends that, while she did request that the hospital (with the family's permission) send the patient over to Green Valley a few hours later than scheduled, she made the request not because she was trying to avoid work, but because at the time the intake procedure was originally scheduled, she was required to accompany a male physician on his rounds which included examining female residents.  Villalpando Dep. at 452-53, 455.  According to Ms. Villalpando, it was common for Green Valley to make such a request; in fact, she made the request in the presence of Ms. Reed and Terry Lynn, the individual responsible for admissions at Green Valley, neither of whom directed that she not make the request; and she had informed Mr. Campbell when she was completing rounds with the physician and Mr. Campbell approved.  Id. at 455-57.

Two weeks later, on July 30, 2005, a CNA called Ms. Villalpando to assess a patient who had been found lying on the floor in her room.  According to Life Care, Ms.

Villalpando's response was limited to instructing the CNA to put the patient back to bed, rather than returning to the room to assess the patient's injuries, reporting the fall to any other nurse on staff, seeking advice from the DON or the Executive Director, calling the patient's treating physician, or completing an incident report setting out her observations. Pankey Dep. at 85.  Further, Life Care claims that when Ms. Villalpando finally did get around to examining the patient at which point she determined that the resident had suffered a black eye, scrapes, and wrist redness, she again failed to complete an investigation or to prepare a follow up report beyond merely noting in the patient's medical chart the existence of bruises on the patient's body.[10]  Life Care contends that the patient's bruises, scrapes, and dried blood were not discovered until two CNA's put the patient back to bed, allegedly per Ms. Villalpando's instructions.  The patient subsequently died after which an anonymous person telephoned the coroner's office to report that one of the CNA's who had put the patient back into bed had beat the resident to death.  As a result of that call, Green Valley's procedures were subjected to intense

---

[10] According to Ms. Jeffrey, in 2005, the policy at Green Valley regarding incident reports provided as follows:

> [I]f it's a fall, you assess the resident, make the incident report, call the – whoever is on call, which at that time I was supervisor and they would let me know if somebody had a fall, then you call the family and the doctor.  And you monitor – you do 72-hour charting on the incident.  If you feel like there is a significant injury then you send them to the hospital. . . . If it's a bruise of unknown origin, then it's an incident report.

Jeffery Dep. at 49.

outside scrutiny[11] ultimately requiring that the deceased resident's body be exhumed in order to verify that the patient had died from natural causes.  Pankey Dep. at 98-99.  Life Care asserts that had Ms. Villalpando sufficiently recorded the incident, the patient's bruises would have been viewed as consistent with a fall, rather than a beating, which would have avoided any need for the exhumation and the surrounding investigation.

Not surprisingly, Ms. Villalpando's version of the events differs in many ways. Ms. Villalpando asserts that after receiving the call from the CNA she immediately went to the patient's room and that, when she arrived, the resident was asleep in bed. According to Ms. Villalpando, she inquired of the patient's roommate to determine what had occurred and the roommate reported that the patient had been found on the floor during LPN Bo Stinson's shift, but that Mr. Stinson had not investigated the situation. Villalpando Dep. at 465-67.  Ms. Villalpando contends that she immediately told the night supervisor, Pat Worsham, of her findings and completed an incident report.  Id. at 462-63; Villalpando Aff. ¶ 7.  She further claims that her supervisor never instructed her to do anything other than, or in addition to, what she had already done in response to the situation and that, based on the investigation of Green Valley's response to the incident, it was concluded that she had properly performed her duties that night.  Villalpando Aff. ¶ 7.

---

[11] According to Life Care, as a result of Green Valley's handling of this incident, it was sanctioned with a "D" severity level deficiency rating, which subjected the facility to monetary penalties and the denial of Medicare payments.

Ms. Villalpando was not terminated as a result of this incident.  Instead, on August 2, 2005, she was given a one-on-one in-service training session with Ms. Berryman regarding the proper procedures for reporting, assessing, and following up on incidents that could be perceived as resident abuse or neglect.  Berryman Dep. at 81, 92.  In the course of the in-service session, Ms. Berryman emphasized the importance of written documentation regarding such incidents, follow up with the responsible parties, notification of the treating physicians, and reports of any resident abuse or injury to Green Valley management.  One week later, on August 10, 2005, Ms. Villalpando was notified that one of the residents for whom she was responsible had been involved in a physical altercation with another resident in the dining room.  Life Care claims that, rather than reacting to the situation in the ways taught during the in-service training session, including assessing her resident's condition, calling the patient's physician, reporting the event to an administrator, or documenting the incident, Ms. Villalpando took no action at all and instead merely explained that she was busy at the time with another resident.  Pls.' Exh. 9 (Villalpando Termination Form).

Ms. Villalpando disputes Life Care's account of this incident.  Ms. Villalpando claims that Martha McMahel, LPN and Director of Human Resources at Green Valley, approached her to say that she (Ms. McMahel) was attempting to respond to a problem involving a new patient who had a serious bleed resulting from a physical altercation with another resident that had taken place in the dining room.  Villalpando Dep. at 600-601. According to Ms. Villalpando, only one of the residents involved in the incident was a

15

patient on her floor for whom she would have been responsible, so she suggested to Ms.

McMahel that she locate Ms. Jeffery, the Unit Director, to address the situation because

Ms. Villalpando was busy at the moment with another patient.  Id. at 603.  Ms.

Villalpando contends that she had no responsibility for documenting the event because

Ms. McMahel reported the incident to Mr. Thomas and Mr. Campbell, and they

completed the appropriate paperwork in accordance with the guidelines set out in the

Employee Handbook.[12]  Following this incident, Life Care contends that, based on Ms.

Villalpando's cumulative performance record, Mr. Thomas, Ms. Pankey, Ms. Berryman,

Ms. Taylor, and Mr. Campbell jointly decided to terminate her employment.

Accordingly, Ms. Villalpando was terminated on August 12, 2005.  Berryman Dep. at

180-81; Pankey Dep. at 125.

---

[12] In support of her contention that the incident was properly documented, Ms. Villalpando cites to Green Valley's policy on Incident Reports, which provides that:

> In the event of an incident . . . the associate involved will assist in the preparation of a report to be made on the appropriate Incident Report form before leaving the shift during which the incident occurred.  Supervisors are responsible for seeing that the report reflects the facts and that the report has been signed by all witnesses involved.

Def.'s Ev. Attachment, Exh. 3 at 22.  The incident report for the August 10th altercation between the two patients was completed by Mr. Thomas and Mr. Campbell (supervisors) and Ms. McMahel (associate involved).  See Pls.' Exh. 42.  Because Ms. Villalpando was neither a witness to the altercation, nor the associate involved, she contends that she had no responsibility to contribute to or otherwise ensure the preparation of the incident report.

16

**Ms. Villalpando's Complaints to Life Care**

Although Ms. Villalpando is uncertain of the precise time when each of the harassing events that she alleges took place, she claims that throughout her tenure at Green Valley Mr. Campbell engaged in inappropriate and harassing behavior towards her on several occasions.  Ms. Villalpando contends that Mr. Campbell once told her that she was "feisty," adding, "I bet you're fun to go out with."  Villalpando Dep. at 241, 246. Another time, Mr. Campbell asked her, "Do you like your coffee black or with cream?" Id. at 249.  Ms. Villalpando did not consider this comment to be harassing until Ms. Reed, who overheard Mr. Campbell's question, told her, "He's asking if you like white men or black men."  Id. at 250-51.  On a different occasion, Ms. Campbell told Ms. Villalpando that he was glad that nurses at Green Valley are required to wear white scrubs because "[y]ou can see the underwear and the bras."  Id. at 278.  In response, Ms. Villalpando stated, "What an idiot."  Id. at 280.

According to Ms. Villalpando, she and Mr. Campbell were alone in the med room together one day when Mr. Campbell stated, "Come here and give me a hug," whereupon he proceeded to hug Ms. Villalpando.  Id. at 318.  Ms. Villalpando also alleges that on one occasion Mr. Campbell ran his fingers through her hair, comparing it to that of a Hispanic female to whom he had previously been engaged (Ms. Villalpando is also Hispanic).  Id. at 240.  On another occasion, a Green Valley resident experienced respiratory distress prompting Ms. Villalpando to go to Mr. Campbell's office to report the incident.  Instead of responding appropriately to the situation, Ms. Villalpando alleges

that Mr. Campbell merely commented, "God you're so cute when you get upset.  You are so cute."  Id. at 283.

Finally, Ms. Villalpando contends that she was present on a number of occasions when Mr. Campbell sang and danced inappropriately to the sexually suggestive "Candy Shop" song to which Ms. Stevens also referred.  Ms. Villalpando contends that she informed Mr. Thomas of Mr. Campbell's singing and dancing and that she did not approve of his (Mr. Campbell's) behavior.  Id. at 284.  When Mr. Campbell touched her hair, she told him to stop, but, after each of the other incidents had occurred, Ms. Villalpando simply "looked at [Mr. Campbell] with disgust and walked off."  Id. at 314-15.

As mentioned above, on June 20, 2005, three days following her initial termination, Ms. Villalpando telephoned Ms. Taylor to complain that she had been wrongfully terminated.  During this conversation, for the first time Ms. Villalpando reported to Green Valley officials that Mr. Campbell had harassed her.  According to Ms. Taylor, Ms. Villalpando during that conversation stated that "she thought Ryan Campbell had been very inappropriate with a lot of his behaviors, that she did not want to get him in trouble, but [that] somebody could misconstrue his actions and interpret it wrong in a different manner."  Taylor Dep. at 29.  When Ms. Taylor further questioned Ms. Villalpando about the alleged harassment, Ms. Villalpando "stated that she felt that Ryan [Campbell] was too friendly with her in regards to making comments about her looks and always giving her hugs."  Taylor Dep. Exh. 50 (Report on June 20, 2005, Complaint).

18

According to Life Care, as a result of this conversation, Ms. Taylor directed Mr. Thomas to address Mr. Campbell's behavior and provide him with written performance counseling. Id. Although Mr. Thomas could not corroborate the allegations, Life Care contends that Mr. Thomas warned Mr. Campbell that any such behavior was unacceptable and must stop. However, in her deposition, Ms. Taylor testified that she could not recall whether anyone actually spoke with Mr. Campbell about Ms. Villalpando's concerns. Taylor Dep. at 34. As an additional precaution, after Ms. Villalpando was reinstated to her employment with Green Valley, Ms. Berryman was assigned the responsibility of directly monitoring Ms. Villalpando's performance, replacing Mr. Campbell as the supervisor responsible for decision-making and recommendations regarding Ms. Villalpando's schedule, work assignments, or continued employment. Mr. Campbell's only remaining responsibility was to carry out discipline imposed against Ms. Villalpando when and as instructed by others to do so. Pankey Dep. at 123-24.

Beyond her telephone call to Ms. Taylor, it is unclear exactly when and to whom Ms. Villalpando complained regarding Mr. Campbell's behavior. According to Ms. Villalpando, her co-worker, Ms. Reed, witnessed each of the allegedly harassing incidents and discussed Mr. Campbell's actions with her. Ms. Villalpando also contends that at some point, she reported Mr. Campbell's behavior to Ms. Haney and also told Mr. Thomas that Mr. Campbell "needs to behave himself" and that his behavior "needs to stop." Id. 284. According to Life Care, Ms. Villalpando discussed with Ms. Taylor on June 20, 2005, the hair touching, the hugging, and Mr. Campbell's comment describing

19

Ms. Villalpando as "feisty" and that she would be fun to go out with, but did not report any of the other alleged incidents of harassing behavior until after her second termination on August 12, 2005, in conjunction with the filing of her EEOC charge.

Subsequent to her reinstatement, Ms. Villalpando also complained about behavior she characterized as retaliatory. After she was notified of her reinstatement, but before she officially returned to work, she contends that Mr. Thomas approached her while she was visiting Green Valley and asked, "Aren't you afraid of retaliation?" Villalpando Dep. at 324. In response, Ms. Villalpando says she stated, "Since you mentioned retaliation, I'm going to put on my calendar, and whatever I find is different, I'm going to document." Id. at 324. After she returned to work following her reinstatement, Ms. Villalpando told Ms. Taylor and Mr. Campbell that, rather than being assigned on a more settled basis to a home floor, her duty posts began to be switched between floors on a more frequent basis than other nurses, but, she admitted, she was not sure who was in charge of the scheduling. Id. at 338-39, 341; Taylor Dep. at 41-42.

On another occasion, Ms. Villalpando contends that she was disciplined for wearing red scrubs, rather than white scrubs, which she had had to change into because she had spilled coffee on her white scrubs. According to Ms. Villalpando, a number of other nurses were also out of uniform and, so far as she could tell, they were not disciplined as she was. Villalpando Dep. at 355-56. Ms. Villalpando also contends that on one occasion she was left off the daily schedule altogether and, when she asked Mr. Campbell why she had been left off the schedule, he informed her that he did not know.

20

Id. at 367-68, 411.  Finally, Ms. Villalpando alleges that she worked on the July 4th

holiday and was supposed to receive a $50.00 Wal-Mart gift card as a reward for doing

so.  However, she contends that she received only a $20.00 or $25.00 gift card, while all

the other nurses who worked received the full fifty dollars.  Id. at 393-94.  These

instances are all cited by Ms. Villalpando as evidence of retaliation against her by Life

Care/Green Valley.


**Plaintiffs' Allegations Related to Their Wage Claims**

Ms. Villalpando alleges that, at some point after Mr. Campbell and Mr. Thomas

began working at Green Valley, she noticed a discrepancy in the payroll checks she was

receiving and reported the shortage to Mr. Thomas, Mr. Campbell, and to the corporate

office.  Villalpando Dep. at 22-24.  According to Ms. Villalpando, she reported the

payroll discrepancies to Ms. Taylor at the same time that she complained about her initial

termination and again during Ms. Taylor's subsequent visit Green Valley.  However, Ms.

Villalpando was terminated for the second and final time before Ms. Taylor responded to

her complaint about her salary shortage.  Id. 30-31.  Following her reinstatement, Ms.

Villapando contends that, contrary to company policy, she was not paid for the time

between June 17, 2005, and June 27, 2007, when she had been off work following her

first termination.  Villalpando Aff. ¶ 12.  Additionally, Ms. Villapando claims she is owed

payment for one day that she came in on her day off in order to fill out reports required by

Green Valley.  Finally, she alleges she was shorted one hour of pay on the day she was

terminated, when an unknown individual clocked her out at 3:00 p.m., even though she

maintains that she was in a meeting with Mr. Campbell until after 4:00 p.m.[13]

Villalpando Dep. at 22; Villalpando Aff. ¶ 13.

Ms. Stevens contends that, although she does not know the exact days, she knows

that on several occasions the amount of her paychecks differed from what they were

supposed to be and that she worked through lunch breaks but was not paid for that time.

Stevens Dep. at 313-14.  According to Ms. Stevens, when she informed Ms. Jeffery of

these discrepancies, Ms. Jeffery responded, "I wouldn't doubt it.  They've been in trouble

for that before."  Id. at 312.  However, Ms. Stevens acknowledges that she did not report

these pay discrepancies to anyone else at Green Valley because, she said, she thought that

she would lose her job if she did.  Id. at 311.  Additionally, Ms. Stevens contends that she

did not receive pay for her seventy-one hours of vacation time when she was terminated

and testified that she knows Green Valley's policy cannot be "if you don't give oral sex,

you lose your job and don't get your vacation pay."  Id. at 308.


## Legal Analysis

### I.     Standard of Review

Summary judgment is required when the record shows that there is "no genuine

---

[13] Ms. Villalpando contends that Ms. Haney once told her that the supervisors "time check," meaning that they sit in the office and change employees' hours.  Villalpando Dep. at 26.  However, in her deposition, Ms. Haney denied this allegation and testified that she had never said anything to Ms. Villalpando about time checking.  Haney Dep. at 101-102.

issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  See id. at 255. However, neither the "mere existence of some alleged factual dispute between the parties," id. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  Michas v. Health Cost Controls of Illinois, Inc., 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case.  Id. at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes.  Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994).  Thus, after drawing all reasonable inferences from the facts in favor of the

non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate.  See Shields Enter., Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989).  But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but mandated.  See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003).   Further, a failure to prove one essential element "necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 323.

## II.    Title VII Claims

### A.    Hostile Environment

Ms. Stevens and Ms. Villalpando contend that Life Care subjected them to a hostile work environment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1981, due to Mr. Campbell's sexually offensive behavior.  Life Care rejoins that Mr. Campbell's behavior was neither sufficiently severe nor pervasive to be considered objectively hostile, and thus, Plaintiffs' hostile environment claims must fail.

In Meritor Sav. Bank v. Vinson, 477 U.S. 57 (1986), the Supreme Court clarified that the "terms, conditions, or privileges of employment" provision in Title VII encompasses *environmental* conditions of employment, and that the scope of the prohibition "is not limited to 'economic' or 'tangible' discrimination."  Id. at 64.

Therefore, a plaintiff may establish a violation of Title VII by proving that discrimination based on a protected class has created a hostile or abusive work environment.  In order to rise to the level of a hostile work environment that violates Title VII, a plaintiff must show: "(1) that the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability." Mendenhall v. Mueller Streamline Co., 419 F.3d 686, 691 (7th Cir. 2005).  In order to determine whether a working environment is hostile, courts may consider factors including "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Hilt-Dyson v. City of Chicago, 282 F.3d 456, 463 (7th Cir. 2002), cert. denied, 537 U.S. 820 (2002) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)).  Conduct that is unpleasant, but is not severe or pervasive, will not constitute a hostile work environment prohibited by Title VII.  See Saxton v. American Telephone and Telegraph Co., 10 F.3d 526, 533 (7th Cir. 1993).

Thus, Title VII is not designed to purge from the workplace "the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers." Baskerville v. Culligan Intern. Co., 50 F.3d 428, 430 (7th Cir. 1995).  It is well-established under Seventh Circuit precedent that "Title VII does not mandate admirable behavior from employers, thus simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions

25

of employment." Haugerud v. Amery School Dist., 259 F.3d 678, 693 (7th Cir. 2001)

(quotations omitted).  However, "sexual assaults; other physical contact, whether

amorous or hostile, for which there is no consent express or implied; uninvited sexual

solicitations; intimidating words or acts; obscene language or gestures; pornographic

pictures," Baskerville, 50 F.3d at 430, can be actionable under Title VII.  While disputes

of fact abound in this case, none of them are material in the context of a hostile

environment analysis.  We agree with Defendant that the behavior at issue here,

assuming, as we must, that it occurred exactly as Plaintiffs describe, cannot as a matter of

law constitute a hostile work environment because it is neither sufficiently severe nor

pervasive to be considered objectively hostile.[14]


## 1.    Evidence From Other Employees

The court first addresses Plaintiffs' contention that rumors were circulating at

Green Valley that other female nurses in addition to themselves were allegedly subjected

to similar harassing behavior by Mr. Campbell.  Evidence regarding harassment of other

employees can be relevant to a plaintiff's hostile environment discrimination claim if the

plaintiff "was present for such acts, if they were directed at [the plaintiff], or if [the

---

[14] Additionally, we note that it is questionable whether Plaintiffs found Mr. Campbell's behavior to be even subjectively hostile, considering that a number of these events were never officially reported and appear to have been treated lightly by Ms. Stevens and Ms. Villalpando. However, a definitive determination of this issue is unnecessary, as Plaintiffs are clearly unable to demonstrate that the conduct was sufficiently severe or pervasive to be considered objectively hostile.

plaintiff] knew of such acts at or near the times they occurred." <u>Fulmore v. Home Depot,</u> <u>U.S.A., Inc.</u>, 2006 WL 839464, at *15 (S.D. Ind. March 30, 2006) (Hamilton, J.) (citations omitted).

Here, however, Plaintiffs cite to nothing more than rumors and innuendo, largely concerning Mr. Campbell's alleged practice of dating nurses at Green Valley and supposedly giving those he dated more favorable treatment in the workplace. Even assuming that such assertions were admissible and amounted to evidence of discrimination, which in our view they do not,[15] there is no evidence here that Ms. Stevens and Ms. Villalpando were present to witness or otherwise be subjected to harassment of any other individual at Green Valley or that any of that alleged harassment was directed at them; in fact, it is not clear exactly when or how Ms. Stevens and Ms. Villalpando learned of the rumors. Thus, these allegations do not bear any relevance to Plaintiffs' hostile environment claims.

### 2.      Ms. Stevens's Allegations of Sexual Harassment

The sum total of Ms. Stevens's allegations of sexual harassment are as follows: (1) on one occasion, Mr. Campbell called the nursing station, asked Ms. Stevens to come see him, complimented her appearance, and asked her if she would give him "a little head";

---

[15] To meet the second prong of the *prima facie* analysis, to wit, that the harassment be "based on sex," Plaintiffs must demonstrate that they were harassed because they are female, not for some other reason. Thus, evidence of "a supervisor favoring his 'paramour' over other employees does not constitute sex discrimination." <u>Russell v. Chicago Bd. of Educ.</u>, 90 Fed. Appx. 966, 967 (7th Cir. 2004).

(2) Mr. Campbell once approached her from behind and hugged her; and (3) on several occasions, Mr. Campbell sang a lewd song and made grinding gestures in front of a number of nurses, including Ms. Stevens.  We cannot conclude from these allegations that they add up to anything beyond a few, isolated incidents of boorish behavior by an individual with an obviously adolescent sense of humor.  Although offensive, a one-time request for "head" over the telephone does not constitute actionable harassment under Title VII.  While it is true that the Seventh Circuit has found in some circumstances that sexual solicitations can be sufficiently severe to implicate Title VII protections, the allegation made here by Ms. Stevens is not comparable.

In Quantock v. Shared Marketing Services, Inc., 312 F.3d 899 (7th Cir. 2002), the Seventh Circuit found that, in combination with other allegations of harassment, the plaintiff's allegation that, while in a private meeting, the president of the defendant corporation propositioned her for sex three times (first for oral sex, then for a threesome, and finally for phone sex) amid her protestations, was sufficiently severe that a reasonable jury could find that it had altered the terms of the plaintiff's employment.  However, unlike the situation in Quantock, where repeated requests for sex were made face-to-face in an isolated setting by the senior officer in the business, in this case Ms. Stevens alleges only that Mr. Campbell made a single request for oral sex, and not even in person, but merely over the telephone.  She does not claim that Mr. Campbell persisted in his advances after she refused his request and hung up on him or that at any other time he made a similar request in person.  Although obviously offensive and surely not to be ever

28

encouraged, especially in an employment setting, we are unable to find that such behavior rises to the level of severity necessary to be actionable under Title VII.

Ms. Stevens's remaining allegations (that Mr. Campbell once hugged her after approaching her from behind and that he sang and danced to a sexually inappropriate song in front of a number of nurses) are likewise not sufficiently severe or pervasive to be considered objectively hostile.  The hug is the only allegation of physical harassment alleged by Ms. Stevens.  The Seventh Circuit recognizes that physical harassment, like verbal harassment, lies along a continuum and that "[t]here are some forms of physical contact which, although unwelcome and uncomfortable for the person touched, are relatively minor . . . A hand on the shoulder, a brief hug, or a peck on the cheek lie at this end of the spectrum."  Hostetler v. Quality Dining, Inc., 218 F.3d 798, 808 (7th Cir. 2000).  Ms. Stevens claims that, on this one occasion, Mr. Campbell hugged her after approaching her from behind and thanked her for working overtime.  In response, Ms. Stevens said "thank you" and no further contact between the two took place.  We are unable to find that a reasonable juror could find this admittedly overly amorous gesture, even when considered in conjunction with Ms. Stevens's other allegations, to be sufficiently severe to alter Ms. Stevens's work environment.

Finally, Ms. Stevens contends that, on a number of occasions, Mr. Campbell sang and danced provocatively to a song containing sexually suggestive lyrics in an apparent attempt to entertain a group of nurses.  Clearly, the singing and dancing were not directed at Ms. Stevens (or any other individual present at the time, for that matter), nor does Ms.

Stevens allege that Mr. Campbell tried to make physical contact with her or any of the other nurses while performing the song.  In short, although thoroughly sophomoric, such conduct amounts to nothing more than immature, attention-seeking behavior, not to actionable sexual harassment that supports a hostile environment claim.

### 3.    Ms. Villalpando's Allegations of Sexual Harassment

Although slightly more frequent, Ms. Villalpando's allegations of sexual harassment are no more severe than Ms. Stevens's and, thus, also fail to rise to the level of severity or pervasiveness necessary to support a hostile environment claim.  We begin by addressing Ms. Villalpando's allegations of verbal harassment.  She claims that Mr. Campbell made several inappropriate comments to her throughout their shared tenure at Green Valley, including: (1) asking Ms. Villalpando, "Do you like your coffee black or with cream?" which, though not understood at the time by her to have such a connotation, Ms. Villalpando now contends was in reference to her dating preferences; (2) calling Ms. Villalpando "feisty" and stating, "I bet you're fun to go out with"; (3) touching Ms. Villalpando's hair and comparing it to that of a Hispanic women to whom he was previously engaged; (4) commenting that the dress code at Green Valley required the nurses to wear white scrubs because "you can see the[ir] underwear and the bras"; (5) responding to a serious work-related concern raised by Ms. Villalpando with the irrelevant retort, "God, you're so cute when you get upset"; and (6) singing and dancing to a song with sexually suggestive lyrics at the nurses' station in th presence of herself

30

and several other employees.

Even taken together, these incidents are much too innocuous to meet the legal threshold required to demonstrate an objectively hostile environment based on sex harassment.  Ms. Villalpando allegations of verbal harassment are comprised of only a handful of comments, all of which are similar to those made in Baskerville v. Culligan International Co., in which case the Seventh Circuit found that the defendant had said nothing "that could not be repeated on primetime television" and that the comments did not give rise to liability under Title VII.  50 F.3d 428, 431 (7th Cir. 1995).  Additionally, some of Mr. Campbell's behavior, such as the singing and dancing and the comment about white scrubs, was not even directed at Ms. Villalpando.  Another comment, the one regarding Ms. Villalpando's coffee preferences, fails to raise a reasonable inference that the statement was either gender specific or sexual in nature.  Thus, we cannot conclude that Mr. Campbell's alleged comments, even if all true, amount to anything more than immature and offhand remarks which do not constitute actionable harassment.

Ms. Villalpando also alleges two instances of physical harassment in support of her hostile environment claim.  She contends that, on one occasion, Mr. Campbell ran his fingers through her hair, while comparing it to that of his former fiancé, and that, on another occasion, he hugged her in the med room at Green Valley.  As discussed above, the mere existence of physical contact does not automatically create a hostile environment, especially in cases where the it is akin to "[c]asual contact that might be expected among friends" and is not accompanied by "aggravating circumstances such as

31

continued contact after an objection." Patton v. Keystone RV Co., 455 F.3d 812, 816 (7th Cir. 2006). We find that the physical harassment alleged by Ms. Villalpando is the type that lies at the less severe end of the spectrum and is insufficient to create an objectively hostile environment.

Ms. Villalpando claims that, because Mr. Campbell hugged her in a relatively isolated area,[16] it constitutes more severe harassment. In support of this contention, Ms. Villalpando cites the Seventh Circuit's decision in Patton v. Keystone RV Company, where the Court of Appeals held that a reasonable jury could find that the plaintiff was subjected to a hostile work environment when she was inappropriately touched by her manager on several occasions within the small confines of the defendant company's recreational vehicles ("RV"). The court in Patton made specific mention of the fact that one of the incidents of physical harassment took place in the "isolated back bedroom of an RV." Id. at 817. However, that court's analysis of the severity of the conduct primarily focused, not on the *location* in which the conduct occurred, but on the *nature* of the physical contact, including one instance in which the alleged harasser "ran his hand all the way up [the plaintiff's] inner thigh, under her shorts, until he touched her underwear." Id. at 817.

The facts here regarding the conduct of Mr. Campbell towards Ms. Villalpando are clearly distinguishable. Even assuming that the med room is fairly comparable to a rear

---

[16] Plaintiffs describe the med room, where the hug allegedly took place, as "a small, quiet little room." Pls.' Resp. at 44.

bedroom in an RV, the conduct at issue in this case (a simple hug) is infinitely more platonic than the behavior exhibited in <u>Patton</u>.  Additionally, before he hugged Ms. Villalpando, Mr. Campbell asked her permission to do so and only proceeded to hug her when she did not decline.  After the hug, Mr. Campbell and Ms. Villalpando went their separate ways and no form of other, more intimate physical contact took place.  Though Ms. Villalpando may have considered the hug unwelcome, we cannot conclude that a reasonable jury could find that it was sufficiently severe so as to have contributed to an objectively hostile environment.

We are also unable to find that the hair touching incident, although arguably more serious conduct than the hug, rises to the level of severity necessary to support a hostile environment claim.  Mr. Campbell's alleged act of running his fingers through Ms. Villalpando's hair, while obviously inappropriate, in no way constitutes "direct contact with an intimate body part," which the Seventh Circuit has determined to be one of the most severe forms of sexual harassment.  <u>See</u> <u>Worth v. Tyler</u>, 276 F.3d 249, 268 (7th Cir. 2001).   Furthermore, when Ms. Villalpando indicated that his conduct was unwelcome and told him to stop touching her hair, Mr. Campbell complied and never repeated such behavior after this encounter.

For the foregoing reasons, we hold that Mr. Campbell's alleged behavior, though unquestionably annoying and immature, was not sufficiently severe and pervasive so as to create an objectively hostile working environment at Green Valley.  Accordingly, we <u>GRANT</u> Defendant's Motion for Summary Judgment as to Plaintiffs' hostile environment

claims.[17]

## B.    Retaliation

Under Title VII, it is unlawful "for an employer to discriminate against any of [its] employees ... because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a).  A plaintiff has two methods of proof available to him or her to demonstrate retaliation.  A plaintiff may prove retaliation either through the direct method of proof or the indirect method, also called the "burden-shifting" method.  See Tomanovich v. City of Indianapolis and Indiana Dep't of Transp., No. 05-1653, slip op. at 6 (7th Cir. Aug. 8, 2006); Moser v. Ind. Dep't of Corr., 406 F.3d 895, 903 (7th Cir. 2005).  It appears from their briefing that Plaintiffs are

---

[17] Ms. Stevens and Ms. Villalpando also bring state-law claims against Life Care for its alleged negligent retention and supervision of Mr. Campbell.  Indiana recognizes a cause of action for negligent supervision and retention of an employee and has adopted the Restatement (Second) of Torts § 317 as the applicable standard with respect to this tort.  Chivers v. Central Noble Community Schools, 423 F. Supp. 2d 835, 855 (N.D. Ind. 2006) (citing Grzan v. Charter Hosp. of Northwest Indiana, 702 N.E.2d 786, 793 (Ind. Ct. App. 1998)).  To prevail on such a claim under Indiana law, a plaintiff must demonstrate that his or her employer knew or had reason to know of its employee's habitual misconduct and failed to take appropriate action.  Id. at 856.

Because, for the reasons explained above, we are unable to find that Mr. Campbell's conduct was sufficiently severe or pervasive to be actionable under Title VII, we also do not find that his behavior constitutes habitual misconduct or endangerment to others, as required to assess liability against an employer under the theory of negligent supervision and retention.  See Briggs v. Finley, 631 N.E.2d 959, 966-67 (Ind. Ct. App. 1994) ("[U]nder the principle of negligent retention an employer may be liable for retaining an employee only if he knows the employee is in the habit of misconducted himself in a manner dangerous to others.").  Thus, we GRANT Defendant's Motion for Summary Judgment as to Plaintiffs' claim of negligent supervision and retention.

proceeding solely under the direct framework, so we shall follow their lead and address only that analysis.  Under the direct approach, a plaintiff must present sufficient evidence to demonstrate that she opposed an unlawful employment practice, that she suffered an adverse employment action, and that there is a causal connection between the two. Haywood v. Lucent Techs., Inc., 323 F.3d 524, 531 (7th Cir. 2003).


### 1.   Adverse Employment Action

The parties do not dispute that Ms. Stevens's and Ms. Villalpando's respective terminations qualify as adverse employment actions.  We agree that their terminations easily satisfy this element.  However, Ms. Villalpando alleges that she suffered additional acts of retaliation, including: (1) having her work station moved from floor to floor more frequently than other nurses; (2) being disciplined for a dress code violation even though other nurses who were out of uniform were not disciplined; (3) being left off the work schedule altogether on one occasion; and (4) receiving a $25.00 Wal-Mart gift card after working over the Fourth of July holiday, instead of the $50.00 gift card that had been promised and apparently received by other nurses.  Life Care contends that these additional allegations of retaliation, even if true, do not qualify as adverse employment actions sufficient to evoke Title VII protections and remedies.

"An 'adverse employment action' is an employment action that is likely to dissuade a reasonable worker from making or supporting a charge of discrimination." Matthews v. Wisconsin Energy Corp., 534 F.3d 547, 558 (7th Cir. 2008) (quoting

Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)).  The

Seventh Circuit has made clear that "not everything that makes an employee unhappy will

suffice to meet the adverse action requirement. . . . Rather, an employee must show that

material harm has resulted from . . . the challenged actions."  Traylor v. Brown, 295 F.3d

783, 788 (7th Cir. 2002) (internal quotations omitted).  In other words, "the challenged

action must result in some significant change in employment status."  Bell v. EPA, 232

F.3d 546, 555 (7th Cir. 2000).  Examples of such material changes include "a termination

of employment, a demotion evidenced by a decrease in wage or salary, a less

distinguished title, a material loss of benefits, significantly diminished material

responsibilities, or other indices that might be unique to a particular situation."  De la

Rama v. Illinois Dep't of Human Servs., ___ F.3d ___ , 2008 WL 4052918, at *3 (7th

Cir. September 2, 2008) (quoting Oest v. Illinois Dep't of Corr., 240 F.3d 605, 612-13

(7th Cir. 2001)).

   We cannot conclude that any of the alleged acts of retaliation to which Ms.

Villalpando contends she was subjected (other than her final termination) rises to the

level of severity necessary to be considered adverse employment actions.  Although it

may have been frustrating for Ms. Villalpando to have her duty station frequently moved

from one floor to another, she did not suffer a decrease in pay or benefits at any time, nor

does she allege that her responsibilities were diminished in conjunction with these moves

between floors.  Cf. Stutler v. Illinois Dep't of Corr., 263 F.3d 698, 703 (7th Cir. 2001)

(holding that a lateral transfer without a loss in benefits does no constitute an adverse

employment action).

With regard to her name being left off the duty roster, Ms. Villalpando concedes that it occurred only once and that Mr. Campbell offered her the opportunity to make up the time she had lost by taking a different shift so that she would not lose a day's pay. This does not provide a basis for Ms. Villalpando's claim that she suffered an adverse employment action. Similarly, having received discipline on one occasion for a dress code violation that was not accompanied by a loss of pay or benefits does not suffice to state an actionable claim. Finally, the Seventh Circuit has held that a denial of a bonus, which we find analogous to the Wal-Mart gift card discrepancy, does not qualify as an adverse employment action. See Lewis v. City of Chicago, 496 F.3d 645, 653 (7th Cir. 2007) (noting that the loss of a "transient payment such as a bonus" is not an adverse employment action). For the foregoing reasons, our remaining retaliation analysis shall include only Plaintiffs' terminations as adverse employment actions.

### 2.     Opposing an Unlawful Employment Practice

Ms. Stevens and Ms. Villalpando did not have to be correct in believing that Mr. Campbell's conduct actually violated Title VII so long as they held "a sincere and reasonable belief" that they were opposing conduct that violated Title VII. See Hayden v. Heart Center of Hendricks County, 2001 WL 1089528, at *8 (S.D. Ind. September 13, 2001) (Barker, J.) (citing Hunt-Golliday v. Metropolitan Water Reclamation District of Greater Chicago, 104 F.3d 1004, 1014 (7th Cir. 1997); Holland v. Jefferson Nat'l Life

37

Ins. Co., 883 F.2d 1307, 1314 (7th Cir. 1989)).  "The objective reasonableness of the belief is not assessed by examining whether the conduct was persistent or severe enough to be unlawful, but merely whether it falls into the category of conduct prohibited by the statute."  Magyar v. Saint Joseph Regional Medical Center, ___ F.3d ___ , 2008 WL 4182647, at *4 (7th Cir. September 12, 2008).  As the Seventh Circuit has recognized, "Title VII does protect employees from discrimination on the basis of sex, and sexual harassment is a recognized species of such discrimination."  Id.

In light of the relatively scant allegations of harassment, coupled with Plaintiffs' own fairly mild reactions to Mr. Campbell's conduct, it is highly unlikely that a reasonable jury could find that Plaintiffs held "sincere and reasonable" beliefs that Mr. Campbell's behavior violated Title VII.  It does not appear from the record that, at the time, either Ms. Stevens or Ms. Villalpando considered Mr. Campbell's antics to be much more than an annoyance.  Before her termination, Ms. Stevens made only informal reports to Ms. Jones and Ms. Jeffrey about the allegedly harassing behavior and never pursued any formal complaint process until after she was terminated.  Ms. Villalpando testified that on most occasions she merely walked away from Mr. Campbell when he engaged in behavior that she considered inappropriate and the record shows that she did not even report a number of incidents that she now contends she considered harassing at the time they occurred.  Plaintiffs' response to Mr. Campbell's behavior belies their contention that, when they complained, they sincerely and reasonably believed that Mr. Campbell's conduct was unlawful.

38

Furthermore, even if Ms. Stevens and Ms. Villalpando could meet this burden, it is still questionable whether their pre-termination complaints rise to the level necessary to constitute statutorily protected expression.  Obviously, "[a]n employer cannot retaliate if there is nothing for it to retaliate against."  <u>Durkin v. City of Chicago</u>, 341 F.3d 606, 615 (7th Cir. 2003).  Here, the reports Plaintiffs made regarding Mr. Campbell's behavior were marginally sufficient to put Life Care on notice that they were complaining of sexual harassment.  Moreover, Plaintiffs tempered their complaints by stating that they did not want Mr. Campbell to get in trouble and following their initial reports regarding Mr. Campbell's conduct, neither Ms. Stevens nor Ms. Villalpando pursued further action until after each was terminated.  However, even if Ms. Stevens and Ms. Villalpando could demonstrate that they engaged in statutorily protected activity, each of their retaliation claims nevertheless fails because neither is able to establish a causal connection between her complaint and the adverse employment action she suffered.

### 3.      Causal Connection

Plaintiffs can prove a causal connection exists either "by showing an admission of discrimination or by 'constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker.'" <u>Ridings v. Riverside Medical Center</u>, 537 F.3d 755, 771 (7th Cir. 2008) (quoting <u>Phelan v. Cook County</u>, 463 F.3d 773, 779 (7th Cir. 2006)); <u>see</u> <u>also</u> <u>Lewis v. School Dist. #70</u>, 523 F.3d 730, 742 (7th Cir. 2008). ("Direct evidence is not required under the direct method of

proof; circumstantial evidence that suggests discrimination, albeit through a longer chain of inferences is sufficient.") (citations and quotations omitted).  Examples of circumstantial evidence include, *inter alia*, "suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the directed group, and other bits and pieces from which an inference of discriminatory intent might be drawn." Boumehdi v. Plastag Holdings, LLC, 489 F.3d 781, 792 (7th Cir. 2007) (citing Troupe v. May Dep't Stores Co., 20 F.3d 734, 736 (7th Cir. 1994)).

Neither Ms. Stevens nor Ms. Villalpando has presented direct evidence of retaliation.  Direct evidence "essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus."  Rogers v. City of Chicago, 320 R.3d 748, 753 (7th Cir. 2003).  No such evidence has been adduced here.[18]  Thus, to prevail on their retaliation claims, Ms. Stevens and Ms. Villalpando must rely on circumstantial evidence.  We address each plaintiff's case in turn.

*Ms. Stevens*

Ms. Stevens contends that the proximity in time between June 25, 2005, when she claims that she talked to Ms. Jones and Ms. Jeffrey about Mr. Campbell's telephone call,

---

[18] Ms. Villalpando does allege that, on an unspecified date after she was notified of her reinstatement but before she returned to work, Mr. Thomas approached her and asked, "Aren't you afraid of retaliation?"  Villalpando Dep. at 324.  However, this statement does not constitute direct evidence in support of Ms. Villalpando's retaliation claim because the Seventh Circuit has held that, to be direct, the evidence "must not only speak directly to the issue of discriminatory intent it must also relate to the specific employment decision in question."  Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999) (citations omitted).

and July 6, 2005, the day of her termination, raises an inference of causation.  It is true that the Seventh Circuit has observed that "[s]uspicious timing, together with other facts, can sometimes raise an inference of a causal connection."  Magyar, 2008 WL 4182647, at *5 (citing Lalvani v. Cook County, 269 F.3d 785, 790 (7 Cir. 2001); Paluck v. Gooding Rubber, Co., 221 F.3d 1003, 1009-10 (7th Cir. 2000)).  However, it is well established in the Seventh Circuit that "mere temporal proximity between the [statutorily protected activity] and the action alleged to have been taken in retaliation for that [activity] will rarely be sufficient in and of itself to create a triable issue."  Stone v. City of Indianapolis Public Utilities Div., 281 F.3d 640, 644 (7th Cir. 2002).

According to Ms. Stevens, the fact that, after hearing about Mr. Campbell's telephone call from Ms. Jones, Mr. Thomas supposedly told Ms. Jones that he was concerned that Ms. Stevens would go to corporate regarding the incident constitutes additional evidence which, in conjunction with temporal proximity, supports an inference of a causal link between her complaint and her termination.  We disagree.  This "he said-she said" allegation is insufficient to raise an inference of a causal connection, especially considering that Ms. Stevens never threatened to tell corporate or utilize any of the other mechanisms in place at Green Valley for reporting harassment.  Thus, we find no reason to deviate from the Seventh Circuit's well-settled principle that mere temporal proximity is rarely enough to create a triable issue.

Further, even if Ms. Stevens had presented sufficient evidence to raise an inference of causation, we find that Life Care is nevertheless entitled to summary judgment on her

41

retaliation claim because it has demonstrated that Ms. Stevens's supervisors eliminated her job for a legitimate business reason and would have taken the same action even without a retaliatory motive.  See Stone v. City of Indianapolis Public Utilities Div., 281 F.3d 640, 644 (7th Cir. 2002) (holding that defendant is entitled to summary judgment when defendant presents "unrebutted evidence that he would have taken the adverse employment action against the plaintiff even if he had had no retaliatory motive . . . because [in that case] he has shown that the plaintiff wasn't harmed by the retaliation."). Ms. Stevens does not dispute that, on June 23, 2005, two days before she alleges she received the harassing telephone call from Mr. Campbell, she had already been issued a second written warning for her alleged use of inappropriate language with a co-worker, Ms. Reed.  The written warning provided that, if the problem persisted, termination would be the next disciplinary step.

On June 30, 2005, Ms. Stevens had a meeting with Ms. Pankey, Mr. Thomas, and Ms. Berryman in which they further discussed the verbal altercation between Ms. Stevens and Ms. Reed and informed Ms. Stevens that, thereafter, she was not allowed to speak with anyone who was not then present about the incident or the meeting.  However, immediately following that instruction, Ms. Stevens concedes that in order to receive permission to take break, she told Ms. Jeffrey about how upset she was regarding what had transpired in the meeting.  Ms. Jeffrey reported to Ms. Pankey that Ms. Stevens had told her about the meeting, which Life Care contends, in conjunction with the original incident between Ms. Stevens and Ms. Reed, led to Ms. Stevens's termination on July 6,

42

2005.  In light of this evidence, we find that Life Care has established that it would have taken the same action in terminating Ms. Stevens even if it had had a retaliatory motive, a matter about which there is no factual dispute.  Accordingly, we <u>GRANT</u> Defendant's Motion for Summary Judgment on Ms. Stevens's retaliation claim.

*Ms. Villalpando*

Ms. Villalpando asserts that the relatively short amount of time between her first complaint to Ms. Taylor on June 20, 2005, and her final termination on August 12, 2005, coupled with the circumstances surrounding her first termination and the fact that Mr. Campbell was the person who signed her termination papers, support an inference of a causal connection.   However, Ms. Villalpando is unable to demonstrate that but for her complaints regarding sexual harassment, she would not have been terminated.  Life Care contends that Ms. Villalpando was fired due to recurring deficiencies in her job performance.  There is ample evidence in the record regarding complaints about Ms. Villalpando's demeanor and job performance throughout her tenure at Green Valley.  Clearly her supervisors provided her with a number of opportunities to learn from her mistakes and correct the deficiencies in her performance by providing her with in-service training opportunities and counseling.  Further, while Ms. Villalpando proffers alternative explanations for why she behaved in certain situations the way that she did and disputes Life Care's characterization of some of her actions, she concedes that there were complaints made regarding various deficiencies in her performance and that, at times, she

made mistakes due to her inexperience.

A nonmoving party must do more than raise a "metaphysical doubt" as to the material facts in order to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Ms. Villalpando has failed to establish the causal link between her June 20, 2005, complaint regarding Mr. Campbell's conduct and her termination of employment two months later, particularly since her "complaint" had been expressed by her more as comments and observations than a complaint, *e.g.*, Mr. Campbell's behaviors were "inappropriate" but she "did not want him to get in trouble" and "somebody could misconstrue his actions and interpret it wrong in a different manner" and that Mr. Campbell was "too friendly with her." Thus, we find that Life Care has demonstrated that Ms. Villalpando was terminated, not for this sexual harassment complaint, but for her poor work performance and no reasonable jury could conclude otherwise based on the evidence adduced here. For the foregoing reasons, we GRANT Defendant's Motion for Summary Judgment on Ms. Villalpando's retaliation claim.

**B.    Wage Claims**

Ms. Stevens and Ms. Villalpando allege that Life Care also failed to properly pay them for time they worked, in violation of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), and failed to pay them wages due, in violation of the Indiana Wage Payment Statute, Ind. Code § 22-2-5 *et seq.* Life Care rejoins that Plaintiffs allege only that they are owed unspecified amounts for unspecified hours they worked on unspecified

days, but have not produced any evidence to support those claims as required under the

FLSA.  Additionally, Life Care contends that Plaintiffs were required to bring their state

law claims, not under the Indiana Wage Payment Statute (which applies to current

employees and those who voluntarily leave employment), but under the Indiana Wage

Claims Statute, Ind. Code § 22-2-9 *et seq.* (which applies to employees who have been

separated from work by their employer).  Life Care further asserts that, even if Plaintiffs

had brought the correct claim, they could not proceed under the Wage Claim Statute

because they did not first submit their claims to the Indiana Department of Labor as

required by that statute.


### 1.     Federal Claims

An employee who brings suit under the FLSA for unpaid minimum wages "has the

burden of proving that [she] performed work for which [she] was not properly

compensated."  Shelton v. Family Dollar Stores of Indiana, LP, 2007 WL 1597650, at *6

(S.D. Ind. 2007) (Tinder, J.) (quoting Anderson v. Mt. Clemens Pottery Co., 328 U.S.

680, 687 (1946), superseded by statute on other grounds as stated in IBP, Inc. v. Alvarez,

546 U.S. 21, 41 (2005)).  However, "[d]ue regard must be given to the fact that it is the

employer who has the duty under . . . [the FLSA] to keep proper records of wages, hours

and other conditions and practices of employment and who is in position to know and to

produce the most probative facts concerning the nature and amount of work performed."

Id.  "[O]nce an employee establishes a violation of the FLSA, the plaintiff must establish

45

damages, and that . . . task is not a difficult one where the employer has kept time records in compliance with the requirements of the FLSA."  Brown v. Family Dollar Stores of IN, LP, 534 F.3d 593, 595 (7th Cir. 2008).  In situations in which the employee claims that the employer failed to keep proper and accurate records as required under the FLSA, however, "an employee has carried out his burden if he proves that [she] in fact performed work for which [she] was improperly compensated *and if [she] produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference*."  Id. (quoting Anderson, 328 U.S. at 687-88) (emphasis added).

Plaintiffs contend that Life Care maintains inaccurate records and has a practice of failing to pay its employees for hours worked, including instances in which its employees were not paid for times when they worked through their lunch hours or other breaks.  In support of this contention, Plaintiffs cite to the testimony of a former Green Valley employee, Penny Reed, who testified by affidavit that, "[d]uring my nine years at Green Valley, I recall a time when the company made back payments to hourly employees who claimed they were not paid for time they worked which involved employees working through their break time."  Reed Aff. ¶ 6.  Additionally, Plaintiffs cite to a report made by Michelle Pirkle, an employee of Life Care's People Development division, concerning her observations made while visiting Green Valley on August 16, 2005, through August 17, 2005.  In that report, Ms. Pirkle notes that "[l]unches are not being taken, but associates are not paid for it."  Pls.' Exh. 53.  Ms. Villalpando also contends that Ms. Haney told her that she [Ms. Haney] had seen supervisors "time check" or change

employee's timesheets.[19]  Finally, Ms. Stevens contends that, when she mentioned the discrepancies she had noticed in her paychecks to Ms. Jeffrey, Ms. Jeffrey told her that she was not surprised because Green Valley had had similar problems before.  We find that these allegations at least raise an issue of material fact regarding whether Life Care kept proper and accurate records.  Thus, Plaintiffs must produce sufficient evidence to raise a just and reasonable inference regarding the amount of work performed for which they contend they were not compensated.

*Ms. Stevens's FLSA Claim*

Ms. Stevens is unable to identify with specificity the hours, the days, or even the number of days for which she worked that she was not properly paid, contending merely that over a time span of a year and a half, several of her paychecks were altered. Additionally, while she testified that on some occasions she would only get ten minutes for lunch, she admitted that she would simply take a longer lunch the next time to make up the difference.  This testimony on its own is insufficient to satisfy Ms. Stevens's burden of producing sufficient evidence to raise a just and reasonable inference regarding the amount of work performed for which she contends she was not compensated. Although she claims that "several" of her paychecks were off, she produces no evidence

---

[19] Ms. Haney testified in her deposition that she never said anything to Ms. Villalpando about time checking, but we consider the facts in the light most favorable to a nonmovant on summary judgment.

in support of that contention.  Additionally, she testified that when she was shorted time on lunch breaks, she would merely make it up herself on the next break.  Accordingly, we GRANT Defendant's Motion for Summary Judgment on Ms. Stevens's claim brought pursuant to the FLSA.

*Ms. Villalpando's FLSA Claim*

Ms. Villalpando contends that, although she cannot remember which specific days, she also worked through a number of lunch periods for which she was not paid.  Additionally, she claims that she is owed payment for one day that she came in on her day off in order to fill out a patient report and was not compensated.  She also alleges that she is owed one hour's pay from August 12, 2005, the day she was terminated, because she claims that someone clocked her out at 3:00 p.m., even though she was in a meeting with Mr. Campbell until after 4:00 p.m.  Ms. Villalpando has offered evidence that she worked on certain specified occasions and claims that she was not paid for that work, which we find allows a just and reasonable inference as to the amount and extent of time for which she was not adequately compensated.

Thus, in Ms. Villalpando's case, the burden shifts to Life Care to present "evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence."  Anderson, 328 U.S. at 687-88.  Life Care contends that it has met its burden by producing its time sheets.  However, as this court held in Shelton, "it is not this court's role to judge this

48

evidence at this stage." 2007 WL 1597650, at *9; see also Washington v. Haupert, 481 F.3d 543, 550 (7th Cir. 2007) ("On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for the factfinder."). Accordingly, we DENY Defendant's Motion for Summary Judgment on Ms. Villalpando's FLSA claim.

### 2.    State Law Claims

Plaintiffs also assert state wage claims pursuant to the Indiana Wage Payment Statute. Ms. Villalpando contends that she is owed back pay for the time she was off work between her first termination and her subsequent reinstatement (from June 17, 2005, to June 27, 2005). Ms. Stevens claims that she is owed compensation for the seventy-one vacation days she had accumulated at the time of her termination. Life Care is correct that, because Ms. Stevens and Ms. Villalpando are both former employees who were terminated from their employment, they can proceed only under the Indiana Wage Claims Statute. Shelton v. Family Dollar Stores of Indiana, LP, 2007 WL 1597650, at *10 (S.D. Ind. June 1, 2007) (Tinder, J.) (holding that the Wage Payment Statute is inapplicable to terminated employees). Therefore, we GRANT Defendants' Motion for Summary Judgment on all claims under the Wage Payment Statute.[20]

---

[20] Ms. Stevens and Ms. Villalpando do not refer to the Wage Claim Statute in their complaint, nor do they respond in any subsequent briefing to Life Care's contention that they were required to bring their state claim under the Wage Claim Statute, as opposed to the Wage Payment Statute. However, even if Plaintiffs had brought their claims under the proper statute, it
(continued...)

## III.   Conclusion

For the reasons detailed in this entry, we <u>GRANT IN PART</u> Defendant's Motion for Summary Judgment on both Plaintiffs' hostile environment claims, retaliation claims, and state law wage claims and on Ms. Stevens's FLSA claim.  We <u>DENY IN PART</u> Defendant's Motion for Summary Judgment on Ms. Villalpando's claim brought pursuant to the FLSA.  Pursuant to Rule 54(b), the Court finds that there is no just reason for delay,

---

[20](...continued)
appears that they would nevertheless have failed to meet the proper prerequisites for bringing a suit under the Wage Claim Statute.  A plaintiff bringing a claim under the Wage Claims Statute "may not file a complaint with the trial court.  Rather, the wage claim is submitted to the Indiana Department of Labor."  <u>St. Vincent Hosp. & Health Care Ctr., Inc. v. Steele</u>, 766 N.E.2d 699, 705 (Ind. 2002); <u>see also</u> <u>Naugle v. Beech Grove City Schools</u>, 864 N.E.2d 1058, 1062 n.1 (Ind. 2007) ("[T]he Wage Claims Statute requires that a wage claim be submitted to the Department of Labor for administrative enforcement.") (citations omitted).

After such a claim is submitted, it then becomes "the duty of the commissioner of labor to enforce and to insure compliance with the provisions of this chapter, and to institute or to cause to be instituted actions for penalties and forfeitures provided under this chapter."  Ind. Code § 22-2-9-4(a).  To fulfill those duties, the commissioner "may hold hearings to satisfy himself as to the justice of any claim, and he shall cooperate with any employee in the enforcement of any claim against his employer in any case whenever, in his opinion, the claim is just and valid."  <u>Id.</u>  Further, if necessary, the commissioner "may refer claims for wages under this chapter to the attorney general, and the attorney general may initiate civil actions on behalf of the claimant or may refer the claim to any attorney admitted to the practice of law in Indiana."  Ind. Code § 22-2-9-4(b).

There is no evidence in the record that Ms. Stevens ever submitted her wage claim to the Indiana Department of Labor before filing her complaint with this Court, and thus, she failed to comply with the statute.  <u>See</u> <u>Naugle</u>, 864 N.E.2d at 1062 n.1 ("Because no administrative proceedings have been pursued, the plaintiffs' contentions under the Wage Claim Act are not before us.").  Ms. Villalpando, on the other hand, provided evidence that she did submit her wage claim to the Wage and Hour Division of the Indiana Department of Labor.  However, the evidence demonstrates that she was advised by the Department that her claim could not be processed because it appeared to represent a FLSA claim, not a state law claim.  Thus, there is no evidence that Ms. Villalpando or her counsel received a referral letter from the commissioner or any other official affiliated with the Indiana Department of Labor to initiate actions on behalf of Ms. Villalpando under the Wage Claims Statute.

50

and thus, partial judgment shall issue with respect to the claims of Ms. Stevens.

      IT IS SO ORDERED.

Date:       09/25/2008                                                

                                      SARAH EVANS BARKER, JUDGE
                                      United States District Court
                                      Southern District of Indiana

Copies to:

Debra Sue Andry
MATTOX MATTOX & WILSON
dandry@mmwlaw.net

Karen R. Goodwell
MATTOX & WILSON LLP
krg@mattoxwilson.com

Jan S. Michelsen
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
jan.michelsen@odnss.com